Law Office of Sean M. Kemp
PO Box 494
44 West Market Street
Rhinebeck, New York 12572
Tel.:845-418-5853
Fax.:845-579-5691
Email:sean@seanmkemp.com

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |
|---|---|
| ) | |
| ) | |
| KING ZAK INDUSTRIES, INC.                ) | |
| ) | |
| ) Case No.:17-CV-449 (CS) | |
| )            Plaintiff,          ) | |
| ) | |
| ) | |
| ) | |
|       -against-                 ) | |
| ) | |
| ) | |
| PARAMONT GLOBAL LTD, WEVEEL       ) | |
| LLC, NINGBO EVERGREAT IMPORT      ) | |
| and EXPORT CO., LTD., and CHINA   ) | |
| EXPORT & CREDIT INSURANCE         ) | |
| CORPORATION A/K/A SINOSURE        ) | |
| ) | |
|            Defendants.           ) | |

_____

**WEVEEL'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT. . . . . . . . . . . . . . . 1

II.   RELEVANT FACTUAL BACKGROUND . . . . . . . . . . . 2

      a. WeVeel's Ownership History and Management. . . . . 2

      b. WeVeel's Offices. . . . . . . . . . . . . . . . .5

      c. WeVeel's Relationship with NEIE. . . . . . . . . 5

      d. WeVeel's Relationship with Paramont. . . . . . . 6

      e. WeVeel's Relationship with King Zak. . . . . . . 7

      f. May 2015 Meeting. . . . . . . . . . . . . . . .8

      g. WeVeel Learns About Plastic Plates and Bowls. . . .9

      h. WeVeel's "Inspection" of the Plastic Plates and
         Bowls. . . . . . . . . . . . . . . . . . . . . .10

      i. WeVeel's Role at the June 2016 Meeting . . . . . .11

III.  LEGAL STANDARD FOR SUMMARY JUDGMENT. . . . . . . .13

IV.   POINT I: WEVEEL IS ENTITLED TO SUMMARY JUDGMENT
      DISMISSING PLAINTIFF'S COMPLAINT AS IT IS A SEPARATE
      AND DISTINCT ENTITY WITH NO RELATIONSHIP TO THE
      UNDERLYING TRANSATIONS THAT GIVE RISE TO PLAINTIFF'S
      CLAIMS. . . . . . . . . . . . . . . . . . . . . 14

V.    POINT II: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
      SHOULD BE DENIED AS GENUINE TRIABLE ISSUES OF FACT
      EXIST. . . . . . . . . . . . . . . . . . . . . 21

VI.   CONCLUSION. . . . . . . . . . . . . . . . . . . 23

**TABLE OF AUTHORITIES**

**Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). . . . . . . . . . . . . . . . . .13

Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002). . . 13

Capmark Fin. Group Inc. v. Goldman Sachs Credit Partners L.P., 491 B.R. 335, 350 (SDNY 2013). . . . . . . . . . . . . . . . .22

Celotex Corp. v. Catrett, 477 U.S. 317, 322023, 106 S.Ct.2548, 91 L.Ed.2d 265 (1986). . . . . . . . . . . . . . . . . . 13,14

Etex Apparel, Inc. v. Tractor Intl. Corp., 83 A.D.3d 587, 587-588 (1st Dep't 2011). . . . . . . . . . . . . . . . . . . . 22

Fletcher v. Atex, Inc., 861 F.Supp 242, 244 (S.D.N.Y. 1994). .15

Geyer v. Ingersoll Publications Co., 621 A.2d 784, 793 (Del. Ch. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . .15

Marnavi S.P.A. v. Keehan, 900 F. Supp.2d 377, 391 (D.Del. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Mobil Oil Corp. v. Linear Films, Inc., 718 F. Sup 260, 268-269 (D. Del 1989). . . . . . . . . . . . . . . . . . . . . . . .20

NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 176 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . *passim*

TNS Holdings v. MKI Sec. Cpr., 92 N.Y.2d 335, 339-340 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

United States v. Golden Acres, Inc., 702 F.Supp. 1097, 1104 (D.Del. 1988), *aff'd*, 879 F.2d 857 & 879 F.2d 860 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). . . . . . . 13

**Statutes, Codes and Regulations**

Fed.R.Civ.Procedure. . . . . . . . . . . . . . . . . . . . . .13

Delaware Limited Liability Company Act, Del. Code Ann. Tit. 6,
§18-101 <u>et seq.</u>. . . . . . . . . . . . . . . . . . . . .16,17,18

## **PRELIMINARY STATEMENT**

This is a breach of contract action that involves the sale of plastic plates and bowls by Defendant Paramont Global Ltd. ("Paramont") to Plaintiff King Zak Industries, Inc. ("Plaintiff"). In short, Plaintiff alleges that from 2014 to 2016 it ordered plastic plates and bowls from Paramont and that Paramont breached its contractual obligations to Plaintiff by failing to deliver goods that conformed with Plaintiff's specifications.

Defendant WeVeel, LLC ("WeVeel") is a Delaware limited liability company that does not belong in this action. WeVeel develops and sells children's art and stationery products, such as pencils, markers, and coloring books, throughout the world. It has never developed or sold plastic plates and bowls and it has no connection to the underlying transactions that give rise to the claims asserted by Plaintiff. The only connection that WeVeel has to this case is its limited involvement in trying to assist Plaintiff and Paramont in resolving issues relating to the plastic plates and bowls.

Plaintiff does not assert any direct claims against WeVeel. In fact, Plaintiff admits that it did not order any of the defective product from WeVeel, that it did not pay WeVeel for any of the defective product, that WeVeel did not design or manufacture the defective product and that WeVeel did not ship

the product to Plaintiff. Instead, Plaintiff attempts to hold WeVeel liable for its "damages" by alleging that WeVeel is an alter ego of Paramont and/or Defendant Ningbo Evergreat Import and Export Co., Ltd. ("NEIE"). Plaintiff's claims are without merit.

WeVeel is a separate and distinct entity from Paramont and NEIE. WeVeel did not exercise control over Paramont and Paramont did not exercise control over WeVeel. Likewise, WeVeel did not exercise control over NEIE and NEIE did not exercise control over WeVeel. WeVeel does not commingle its finances with other entities, it does not share employees with other entities, it maintains separate business and financial records from other entities, and there was no overlap in management between Weveel and any other entity. WeVeel was not a façade of Paramont or any other entity. Most importantly, WeVeel did not commit any wrong or fraud against Plaintiff. Accordingly, WeVeel is entitled to summary judgment dismissing Plaintiff's complaint.

**RELEVANT FACTUAL BACKGROUND**

**a. WeVeel's Ownership History and Management**

Defendant WeVeel ("WeVeel") is a Delaware limited liability company that was created in August 2009 by Michael "Mike" Pecci (hereafter "Pecci"), Bill Jones, Yongping Yang ("William Yang") and Jason Lane. See, Declaration of Michael T. Pecci dated June

25, 2018, ("Pecci Dec.") at ¶¶3-4. WeVeel was created to develop and sell various stationery and art products including, but not limited to, pens, markers, pencils, crayons, erasers, dough and coloring books. Id. at ¶5. WeVeel has never sold, developed or manufactured plastic plates or bowls. Id. at ¶7.

When WeVeel was originally formed, Pecci owned 10% of the company, Bill Jones owned 10% of the company, Ningbo Evergreat Import Export Co., Ltd. ("NEIE" a foreign entity affiliated with William Yang) owned 40% of the company, and L3 Sales and Sourcing, Inc. (a domestic corporation affiliated with Jason Lane) owned 40% of the company. See, Id. at ¶18. Through various agreements from 2010-2014, both written and verbal, ownership interests in WeVeel solidified, as follows:  NEIE 70%; Toy Labs 20%; and Mike Pecci 10%. See, Pecci Dec., ¶¶19-23; see also Exhibits "1" – "4" annexed to the Declaration of Sean M. Kemp, Esq. ("Kemp Dec."). This remained the case until April 2018.

On June 8, 2010, WeVeel amended its Operating Agreement and changed, among other things, the voting requirements for members by requiring an affirmative vote of 80% of the voting member interests of WeVeel to take major company actions.  This amendment to the Operating Agreement made it impossible for any major decision to be made unilaterally by NEIE despite the fact

that it owned a majority (approximately 70%) interest in WeVeel. See, Pecci Dec., ¶¶ 25-26; see also, Exhibit "2" to Kemp Dec.

At a meeting held on July 17, 2014, the WeVeel members agreed to change it from a member-managed limited liability company to a manager-managed limited liability company and Pecci was unanimously elected as the manager of WeVeel. See, Exhibit "4" to Kemp Dec. From July 2014 to April 2018, Pecci was the sole manager of WeVeel. See, Pecci Dec., at ¶¶1, and 27-28.

As manager of WeVeel, Pecci was responsible for the day to day operations of the business. See, Pecci Dec., at ¶29. Under his leadership WeVeel experienced an exponential growth in sales. In fact, in 2014, WeVeel received recognition by "Inc." magazine as the 27th fastest growing privately held company in America. See, Id. at ¶31. In 2017, WeVeel had approximately $18 million in sales. See, Id. at ¶30.

While Pecci was WeVeel's manager, he was the only individual that had signing authority on any of WeVeel's bank accounts from July 2014 to April 2018. See, Id. at ¶32. All of WeVeel's finances were maintained separate and independent from any of its members. See, Declaration of Daniel T. Jones, Sr. dated June 27, 2018 ("Jones Dec.") at ¶16. Although, WeVeel did not have formal meetings for its members, Pecci regularly communicated with its members and kept them informed about all aspects of WeVeel's performance. See, Pecci Dec., ¶¶ 29-34.

### b. WeVeel's Offices

When it was first created, WeVeel's headquarters was located at 1128 Blue Mound Road, Haslet, Texas. WeVeel maintained its headquarters at this location from 2009 to 2012. In or around 2012, WeVeel moved its headquarters to 700 Eight Twenty Blvd. Fort Worth, Texas. WeVeel maintained its headquarters at this location from approximately 2012 to 2014. See, Pecci Dec., at ¶¶ 54-57.

From 2012 to 2016, WeVeel also rented design studio space at 60 E Bridge St. Suite 2, Morrisville, PA and operated out of this location. See, Id. at ¶60.

In or around July 2016, WeVeel moved its headquarters to 20 N. Pennsylvania Avenue, Morrisville, Pennsylvania. To date, WeVeel maintains its headquarters at this location. WeVeel has never maintained an office at any location other than the locations set forth above. See, Id. at ¶¶ 58-61.

### c. WeVeel's Relationship with NEIE

In addition to NEIE holding a majority membership interest in WeVeel, WeVeel and NEIE have regularly transacted business with each other since 2010. WeVeel uses NEIE, among others such as China First Pencils and Foshan Master, to source and manufacture some of its products. The decision of what company WeVeel would use for these services was decided solely by Pecci, as the Manager of WeVeel. See, Id. at ¶¶ 39-41.

5

WeVeel pays NEIE fair and reasonable consideration for all goods and services that NEIE provides to WeVeel. See, Id. at ¶¶ 35-37.  In 2015, WeVeel and NEIE transacted approximately $4,881,399 in business with each other. In 2016 and 2017, they transacted approximately $7,843,933 and $10,844,664, respectively, in business with each other. See, Jones Dec., at ¶¶19-21.

### d. WeVeel's Relationship with Paramont

WeVeel and Paramont have regularly transacted business from in or around July 2015 to present and the general nature of the business relationship between WeVeel and Paramont consisted of service related work such as package design and consulting. See, Pecci Dec., at ¶¶43-44.

From 2015-2017, WeVeel created a design services team to work with Paramont due to the high volume of business that WeVeel and Paramont believed that they were going to be doing together. This design team was sometimes referred to, internally, as Paramont. See, Id. at ¶45.  Neither NEIE nor Paramont had any role in the creation of the internal "Paramont" design team. See, Id. at ¶¶47-48.  None of the employees that worked on this design team were Paramont or NEIE employees. They were all WeVeel employees. Although there was no formal written contract governing the relationship between WeVeel and Paramont in this regard, WeVeel would bill Paramont for the

design services that this design team performed. See, Id. at ¶¶81-82.

WeVeel regularly invoiced Paramont for the work that it provided to Paramont and fair and adequate consideration was exchanged between Paramont and WeVeel for these services. In 2015, WeVeel and Paramont transacted approximately $908,828 in business with each other. Additionally, in 2016 and 2017, WeVeel and Paramont transacted, $908,828 and $959,259, respectively, with each other. See, Jones, Dec., at ¶¶27-29.

In April 2016, WeVeel hired Caitlyn Park Kelly ("Kelly") to help develop and improve the work that was being done by the Paramont design team. Kelly was not hired as an employee of Paramont and she did not report to anyone in Paramont. She reported directly to Pecci and she was an employee of WeVeel. Her title of "Vice President" was nothing more than a title. It had no operational significance and she did not have the authority to bind WeVeel absent express authority to do so. See Pecci Dec., at ¶¶ 86-89.

### e. WeVeel's Relationship with King Zak

WeVeel was first introduced to King Zak in or around 2015 at its office in Goshen, NY. King Zak also visited WeVeel's creative studio in Pennsylvania in 2015. See, Id. at ¶90. At one time, WeVeel and King Zak explored sales representation and distribution partnerships. See, Id. at ¶¶92-94. WeVeel even

allocated space for King Zak products at ECRM Home and Gift show in 2015 and, conversely, WeVeel showcased its branded Scentos products in Las Vegas in the King Zak booth at the Las Vegas Housewares show. WeVeel displayed its products which included Scentos Markers and party novelty products. King Zak displayed plates cups and napkins. See, Id. at ¶94. Ultimately, King Zak and WeVeel never ended up formalizing a business relationship with each other. See, Id. at ¶95.

### f. May 2015 Meeting

In May 2015, William Yang, Ben Qing, and John Yu visited WeVeel's office in Morrisville, Pennsylvania for the purpose of discussing design services that WeVeel could provide to Paramont. See, Id. at ¶¶96-97. During the course of the meeting, they informed Pecci that they had a meeting scheduled with King Zak in Goshen, New York. They also informed him that they did not have a means of getting to Goshen, New York and asked if he would drive them to the meeting. Since Pecci was familiar with King Zak and had also wanted to further discuss the possibility of King Zak and WeVeel developing a relationship with respect to WeVeel's Scentos brand novelty/party products, he agreed to drive them. See, Id. at ¶98-100.

On or about May 28, 2015, Pecci drove them to King Zak's office in Goshen, New York. Pecci attended this meeting on behalf of WeVeel. He did not attend this meeting on behalf of

Paramont or NEIE. William, Ben Qing, and John Yu did not attend this meeting on behalf of WeVeel. See, Id. at ¶¶101-105. Herbert Zakarin, Hanna Zakarin, and Noah Slomowitz attended the meeting on behalf of King Zak. The meeting took place in a conference room at King Zak's office and lasted approximately two hours and was broken up into at least two parts. See, Id. at ¶¶106-107.

Pecci only attended the first part of the meeting which related to introductions and general discussions on distribution partnerships for Scentos branded party and associated novelty products. During this meeting there was no discussion of plates or bowls or any other plasticware. At the close of this portion of the meeting, Pecci left the conference room and toured King Zak's facilities with Steven Kaye, King Zak's design manager. Everyone else remained in the conference room and the meeting continued. Pecci has no idea what was discussed during this part of the meeting. See, Pecci Dec., at ¶¶108-110.

### g. WeVeel Learns About Plastic Plates and Bowls

WeVeel was not aware of any issues between King Zak and Paramont until Spring 2016 when Noah Slomowitz, a broker that WeVeel was familiar with from previous unrelated transactions, informed him that there may be quality issues with Paramont's plastic plates and bowls and requested assistance in resolving the matter. Up until this point in time, WeVeel had absolutely

nothing to do with the underlying transactions between Paramont and King Zak for the sale and purchase of plastic plates and bowls. See, Id. at ¶¶112-113.

WeVeel did not deal with plastic plates and bowls in the course of its business and it did not sell, design, or manufacture the products at issue. Further, King Zak did not issue any purchase orders for the plastic plates and bowls to WeVeel, and it did not make any payments to WeVeel for these goods. WeVeel had absolutely nothing to do with, not only the plastic plates and bowls at issue, but it also had nothing to do with the relationship between King Zak and Paramont. See, Pecci Dec., ¶¶114-120; see also, Exhibit "5" to Kemp Dec., at p.15 line 24, p. 16 lines 1-8., p. 36 line 24, p. 37 lines 1-20, p. 39 lines 9-12.

**h. WeVeel's "Inspection" of the Plastic Plates and Bowls**

In or around April/May, 2016, WeVeel received a request from Paramont to send a WeVeel employee to inspect the plastic plates and bowls at issue at King Zak's office/warehouse in Goshen, New York. Paramont made this request because it did not have any employees located in the USA to perform an inspection. Pecci agreed to send two WeVeel employees, J.P. Morgan ("Morgan") and Hongjin Deng ("Deng") to King Zak's office/warehouse to look at the plastic plates and bowls. See, Pecci Dec., at ¶121.

Pecci sent Morgan and Deng based his familiarity with
Paramont and King Zak, not WeVeel's familiarity with the plastic
plates or bowls at issue. See, Id. at ¶¶121-122.  Neither Morgan
nor Deng had any formal training in quality control, quality
assurance or inspection of allegedly defective plastic plates
and bowls. Morgan is a Procurement Manager for WeVeel and Deng
is a Marketing Assistant for WeVeel.  WeVeel sent them as a
courtesy to both King Zak and Paramont in the hopes that it
could help facilitate a resolution of the dispute between the
two parties.  They were not sent as an agent of Paramont. See,
Pecci Dec., at ¶¶123-126.

### i. WeVeel's Role at the June 2016 Meeting

In May or June 2016, Paramont shipped new sample plates to
WeVeel and asked if WeVeel would personally deliver them to King
Zak. Pecci decided to travel with Kelly to King Zak's office to
deliver the new sample product and to gain a better
understanding of how WeVeel could, if at all, facilitate a
resolution of the dispute between King Zak and Paramont.  See,
Id. at ¶¶129-130. Kelly did not attend this meeting as an
employee or Vice President of Paramont.  She attended the
meeting as an employee of WeVeel.  Likewise, Pecci attended this
meeting on behalf of WeVeel, not Paramont.  See, Id. at ¶131.

Unfortunately, at this meeting or shortly thereafter, it
became evident that WeVeel was not in a position to assist in

the resolution of the dispute between King Zak and Paramont. See Pecci Dec., at ¶132. WeVeel did not have any role in developing and/or agreeing to product specifications so it could not determine the nature and extent of the claimed defects. For instance, King Zak was claiming that hot food could not be placed on or in the plastic plates and bowls, but it was not clear that King Zak had specifically ordered plastic plates and bowls designed to be used with hot food. See, Id. at ¶133.

Further complicating the ability for WeVeel to assist in any resolution between the parties was the fact that King Zak could not easily identify all of the product that it claimed to be defective. Instead, the plastic plates and bowls that King Zak claimed to be defective or unsellable were commingled with other products stored in its warehouse. See, Id. at ¶134. At the same time, Paramont was claiming that King Zak did not pay for not only the product that it was claiming to be defective but also other product that it actually sold. See, Id. at ¶135.

Because of previous relationships with the parties, WeVeel attempted to assist in the resolution of this breach of contract dispute between King Zak and Paramont as a show of good faith to King Zak, Paramont and Noah Slomowitz. WeVeel did not receive any compensation from King Zak, Paramont, NEIE or Noah Slomowitz in connection with any of its efforts to resolve this matter. See, Id. at ¶¶137-138. Instead, WeVeel was served with a

Summons and Complaint and has been forced to appear and defend itself in an action that it has absolutely nothing to do with.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322023, 106 S.Ct.2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proving that there is no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party satisfies this burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (internal citations and quotation marks omitted).

On a motion for summary judgment the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments…" Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). Summary judgment is not warranted where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248,

106 S.Ct. 2505.  However, "a complete failure of proof
concerning an essential element of the nonmoving party's case"
renders summary judgment proper.  Celotex, 477 U.S. at 323, 106
S.Ct. 2548.

Here, there are no genuine issues of fact regarding
WeVeel's status as a separate and distinct entity from
Defendants Paramont and NEIE.  WeVeel had no connection to the
underlying transactions that give rise to Plaintiff's claims.
There is no basis in law or fact for WeVeel to remain a party to
this dispute.  Accordingly, it is entitled to summary judgment
dismissing Plaintiff's Complaint.

### POINT I: WEVEEL IS ENTITLED TO SUMMARY JUDGMENT DISMISSING PLAINTIFF'S COMPLAINT AS IT IS A SEPARATE AND DISTINCT ENTITY WITH NO RELATIONSHIP TO THE UNDERLYING TRANSACTIONS THAT GIVE RISE TO PLAINTIFF'S CLAIMS

Plaintiff's sole theory of liability against WeVeel is that
WeVeel was an alter ego of Paramont and/or NEIE and it should,
therefore, be held liable for the damages that it suffered as a
result of Paramont's alleged breach of contract.  To prevail
under this theory, a plaintiff must overcome a very difficult
burden as courts are reluctant to disregard the corporate form.
NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 176
(2d Cir. 2008).

"Under New York choice of law principles, '[t]he law of the
state of incorporation determines when the corporate form will

be disregarded…"  _Fletcher v. Atex, Inc._, 861 F.Supp 242, 244

(S.D.N.Y. 1994).  WeVeel is a Delaware limited liability

company.  Accordingly, Delaware law should be applied to

determine whether WeVeel was an alter ego of Paramont and/or

NEIE.[1]

Under Delaware law, the corporate form will only be

disregarded "where there is fraud or where [the corporation] is

in fact a mere instrumentality or alter ego of its owner."

_Geyer v. Ingersoll Publications Co._, 621 A.2d 784, 793 (Del. Ch.

1992).  To prevail under the alter ego theory, a "plaintiff must

demonstrate that the corporation and owner "operated as a single

economic entity such that it would be inequitable . . .to uphold

a legal distinction between them." _NetJets_, 537 F. 3d at 177.  A

plaintiff must show that (1) the two entities in question

"operated as a single economic entity," and (2) the owner's

actions were unjust or unfair.  _Id._ "[M]ere ownership or

direction of a corporate entity, without more, is not sufficient

to establish that the corporate form should be disregarded."

_Marnavi S.P.A. v. Keehan_, 900 F. Supp.2d 377, 391 (D.Del. 2012)

(internal citations omitted).  "[T]he plaintiff must [also] show

_____

[1] Even under New York alter ego analysis, which is set forth in Plaintiff's
motion papers, WeVeel would not be deemed an alter ego of Paramont and/or
NEIE based on the undisputed facts relating to WeVeel's operations and
management.

some fraud, injustice, or inequity in the use of the corporate form." Id.

The "alter ego analysis must start with an examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation. These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a façade for the dominant shareholder." United States v. Golden Acres, Inc., 702 F.Supp. 1097, 1104 (D.Del. 1988), aff'd, 879 F.2d 857 & 879 F.2d 860 (3d Cir. 1989). "[N]o single factor could justify a decision to disregard the corporate entity, but … some combination of them [is] required, and … an overall element of injustice or unfairness must always be present, as well." Id.

"In the alter-ego analysis of an LLC, somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required. See, e.g., Delaware Limited Liability Company Act, Del. Code Ann. Tit. 6, §18-101 et seq. ("DLLCA") (requiring little more than that an LLC execute and file a proper certificate of

formation, _see id._ §18-201(a), maintain a registered office in Delaware, _see id._ §18-104(a)(1), have a registered agent for service of process in Delaware, _see id._ and maintain certain records such as membership lists and tax returns, _see id._ §18-305(a)." _NetJets_, 537 F.3d at 178.

Here, there can be no dispute that each of these factors favor a finding that WeVeel is a separate and distinct entity and not an alter ego of any co-Defendant named in this action. Most importantly, the absence of any overall element of injustice or unfairness proves that WeVeel should not be held liable for the alleged damages suffered by King Zak.

First, WeVeel was never undercapitalized and remains solvent. WeVeel was formed in August 2009 by Michael Pecci, Bill Jones, L3 Sales and Sourcing, Inc. and Ningbo Evergreat Import Export Co., Ltd. with the purpose of manufacturing and selling stationery and craft related products, such as markers, crayons, stickers etc. It has engaged in this line of business since 2009 and has achieved great success. In 2014, WeVeel received recognition by "Inc." magazine as the 27th fastest growing privately held company in America. See, Pecci Dec., at ¶31. In 2017, WeVeel achieved approximately $18 million in sales. See, Pecci Dec., at ¶30. There is simply no issue regarding undercapitalization or WeVeel's solvency.

Second, WeVeel properly maintains separate and distinct corporate records from any of its members and from any other entity for that matter. See, Jones Dec., at ¶10. Similarly, WeVeel does not commingle any of its finances with any of its members. See, Jones Dec., at ¶16; see also, Pecci Dec., at ¶¶32-33. In fact, only one member, Pecci who owned approximately 10% of WeVeel, had direct access to WeVeel's bank accounts and this is only because he was WeVeel's manager. See, Pecci Dec., at ¶32.

Third, WeVeel is a manager managed LLC. As stated above, Pecci was the manager of WeVeel and was in charge of the day to day operations of the Company. He had no formal managerial role in any other entity named in this litigation. See, Id. at ¶11. Therefore, there was no overlap in the control and/or leadership of WeVeel and Paramont or NEIE.

Fourth, WeVeel observes the formalities imposed by the Delaware Limited Liability Company Act. It filed a proper certificate of formation, DLLCA §18-201(a), it maintains a registered agent and office in Delaware at Agents and Corporations, Inc. 1201 Orange St Ste 600 One Commerce Center, Wilmington, Delaware 19801, see id. §18-104(a)(1), and it maintains membership lists and tax returns, see id. §18-305(a)." NetJets, 537 F.3d at 178. See, Jones Dec., at ¶¶11-14.

Fifth, although Ningbo Evergreat Import Export Co., Ltd. owns approximately 70% of WeVeel. It has never "siphoned" funds

out of WeVeel.  In fact, Ningbo Evergreat Import Export Co., Ltd. did not even have the ability to do so because it had no access to WeVeel's financial accounts.  As set forth above, those accounts were controlled by its manager, Mike Pecci. Moreover, however, even if Ningbo Evergreat Import Export Co., Ltd. attempted to "siphon" funds or exert control over the management of WeVeel it could not do so without the affirmative vote of at least eighty percent (80%) of WeVeel's members, which included The Toy Lab, LLC (20%), Michael Pecci (10%) and Ningbo Evergreat Import Export Co., Ltd. (70%).

Finally, WeVeel operates as a separate and distinct entity. It is not a façade of NEIE. or any other entity.  WeVeel maintains one office, which is located in Morrisville, Pennsylvania.  All of its employees are located in this office. WeVeel provided design services to Paramont, but those services were provided on a fee for service basis and it never provided any design services to Paramont in connection with any of the products that Plaintiff claims to be defective.

Plaintiff's reliance on Defendants' use of similar office addresses and telephone numbers on business cards and websites is not enough to establish alter ego liability.  Plaintiff's failure to produce any admissible evidence, documentary or otherwise, demonstrating that the Defendants operated as a single economic entity is fatal to its motion.  Accordingly,

Plaintiff's motion should be denied and WeVeel should be awarded summary judgment dismissing Plaintiff's complaint.

However, even if these factors favored a finding that WeVeel is an alter ego of Paramont and/or NEIE, which they clearly do not, WeVeel could not be held liable for any alleged damages Plaintiff suffered because Plaintiff has failed to provide any evidence that Paramont's and/or NEIE's alleged control over WeVeel, or vice versa, resulted in the perpetration of a fraud or injustice mandating the disregard of the corporate form. TNS Holdings v. MKI Sec. Cpr., 92 N.Y.2d 335, 339-340 (1998). It is well settled that the fraud or injustice must be found in the use of the corporate form not in the underlying claims. Mobil Oil Corp. v. Linear Films, Inc., 718 F. Sup 260, 268-269 (D. Del 1989). The "injustice" "must be more than the breach of contract alleged in the complaint." Id.

Here, there is no evidence that any defendant has abused the corporate form to perpetrate a fraud. The only allegation of fraud relates to the underlying claims asserted by Plaintiff, which is not sufficient to establish alter ego lability. The thrust of Plaintiff's claims is for a simple breach of contract, i.e. Paramont failed to provide Plaintiff with the quality of goods that it ordered. During discovery it became obvious that at least some of the product that it ordered from Paramont was defective or had serious quality issues, but it was also

revealed that Plaintiff did not pay Paramont for all the goods at issue which is why Paramont evidently submitted a nonpayment claim to its insurance carrier, co-Defendant Sinosure.  See, Exhibit "5" to Kemp Dec., at p.53, lines 19-24.  Thus, this is a bona fide breach of contract dispute between Paramont and Plaintiff, which has nothing to do with fraud or abuse of the corporate form and, more importantly, has nothing to do with WeVeel.

The only reason why WeVeel has been brought into this litigation is because it agreed to try and assist in the resolution of a dispute between the other parties to this action.  Plaintiff did not order any of the defective product from WeVeel.  Plaintiff did not pay WeVeel for any of the defective product.  WeVeel did not design or manufacture the defective product and it did not ship the product to Plaintiff.  Based on the foregoing, this simply is not a case where two entities operated as a single economic entity to perpetrate a fraud or injustice.  Accordingly, WeVeel is entitle to summary judgment dismissing Plaintiff's Complaint.

**POINT II:  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED AS GENUINE TRIABLE ISSUES OF FACT EXIST**

Plaintiff utterly fails to establish its entitlement to judgment as a matter of law in its motion papers.  "Under New York and Delaware law, the separate corporate existences . . .

will not be set aside merely on a showing of common management
of the two entities, nor on a showing that the parent owned all
the stock of the subsidiary." Capmark Fin. Group Inc. v.
Goldman Sachs Credit Partners L.P., 491 B.R. 335, 350 (SDNY
2013).  Even when companies share office space, key employees
and have common owners the corporate form will not be set aside.
See, Capmark Fin Group Inc. v. Goldman Sachs Credit Partners
L.P., 491 B.R. at 350; Etex Apparel, Inc. v. Tractor Intl.
Corp., 83 A.D.3d 587, 587-588 (1st Dep't 2011).

Here, Plaintiff relies on self-serving conclusory
allegations to support its motion for summary judgment against
WeVeel which are insufficient to establish alter ego liability.

At the very least, WeVeel has established that genuine
issues of fact exist with respect to WeVeel's corporate
governance and its relationship with Paramont, NEIE and King Zak
that warrant the denial of Plaintiff's motion for summary
judgment. See, generally WeVeel's Counter Statement of Facts.
WeVeel has also established that the "inspection" of goods by
Morgan and Deng cannot be used to establish whether Paramont
breached its obligations to King Zak.  First, Morgan and Deng
had no formal training in quality control or quality assurance
and did not have any understanding of the relevant product
specifications.  Second, it is unlikely that Morgan and Deng
inspected all the product at issue.  Third, King Zak admits that

it did not pay for the defective product.   Accordingly, for all the reasons set forth above, should this Court deem it appropriate to deny WeVeel's cross-motion for summary judgment, WeVeel respectfully requests that this Court deny Plaintiff's motion for summary judgment as genuine issues of fact exist.

## CONCLUSION

For the reasons set forth above, the motion by Plaintiff for summary judgment should be denied, and WeVeel's cross-motion for summary judgment dismissing Plaintiff's complaint should be granted.

Dated:  June 29, 2018

LAW OFFICE OF SEAN M. KEMP

/s/SEAN M. KEMP

Sean M. Kemp, Esq.
P.O. Box 494
44 West Market Street
Rhinebeck, NY  12572
(845) 418-5853
sean@seanmkemp.com
ATTORNEY FOR DEFENDANT WEVEEL LLC