UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

─────────────────────────────────────

KING ZAK INDUSTRIES, INC.,

                              Plaintiff,

        v.                                          Civil No.: 17-CV-449

PARAMONT GLOBAL LTD,
WEVEEL LLC, NINGBO EVERGREAT
IMPORT and EXPORT CO., LTD.,
and CHINA EXPORT & CREDIT
INSURANCE CORPORATION
A/K/A SINOSURE,

                              Defendants.

─────────────────────────────────────

## <u>AMENDED COMPLAINT</u>

King Zak Industries, Inc. ("King Zak"), by and through its attorneys Hodgson

Russ LLP, alleges for its amended complaint:

### <u>NATURE OF THE ACTION</u>

1.     This action arises out of King Zak's purchase of plastic plates and bowls

from Paramont Global LTD ("Paramont"), which were defective when delivered, failed to

conform to approved samples, and resulted in King Zak having to obtain replacement goods at

significantly higher prices to mitigate its damages. Paramont then filed an insurance claim with

China Export & Credit Insurance Corporation a/k/a Sinosure ("Sinosure"), improperly claiming

that King Zak had not paid its invoices; Sinosure has downgraded King Zak's credit rating in

China, threatened to block any exports from China to King Zak as a result of this dispute, and

improperly interfered with King Zak's relationships with other manufacturers in China by claiming that King Zak does not pay its invoices.

**PARTIES AND JURISDICTION**

**KING ZAK**

2. King Zak is a New York corporation with its principal place of business at 3 Police Drive, Goshen, New York 10924.

3. King Zak is a manufacturer, distributor, and retailer of products for use in the party, catering, and industrial areas, including the Lillian Tablesettings®, Hanna K Signature®, Party Dimensions®, and Nicole Home Collection® product lines.

**PARAMONT**

4. Upon information and belief, Paramont, is a Chinese corporation with its principal place of business at 3-4 F No 1 Building, Hi Tech Science and Technology Square, No 1498 Jiangnan Road, Ningbo, China 315040 and it also maintains an office at 67 Mody Road Tsim Sha Tsui East, Kowloon, Hong Kong, China.

5. Upon information and belief, Yongping "William" Yang is the Chief Executive Officer of Paramont, Michael Pecci is an officer and director of Paramont, and Joseph DiPalma is an officer and director of Paramont.

6. Upon information and belief, Michael Pecci is a resident of the United States and resides in Millstone, New Jersey.

7.     Upon information and belief, Joseph DiPalma is a resident of the United States and resides in Yardley, Pennsylvania.

8.     Upon information and belief, Caitlin Park Kelly is a Vice-President with Paramont who works out of its USA Branch Office at 60 East Bridge Street, Suite 2, Morrisville, Pennsylvania 19067, utilizes an office telephone number of (267) 797-5436, and a cell phone number issued in the United States.

9.     Paramont advertises itself as a leading manufacturer, exporter, and supplier of, among other things, stationary and party products.

10.     Paramont claims that it "operates two wholly owned factories in Ningbo, China and has an established customer base from [*sic*] that spans 45 countries on five continents."

11.     Paramont also advertises that it has "US and Asian product teams" who "work closely with both purchasers and the factories throughout the entire product development lifecycle to ensure that project costs and timeline objectives are met."

12.     Paramont advertises that it "combines US direct innovation with factory direct costs to elevate your private label programs."

13.     According to its website, paramontglobal.com, Paramont maintains a "Global Design & Innovation Center based in the USA."

14.     Paramont also states on its website that its "Global OEM/Private Label partners include: Walmart (US/Canada), ASDA, Tesco, Dollar Tree, Family Dollar, Dollarama, K-Mart, Big Lots, and more."

15.     Paramont identifies its customers as including: Costco Wholesale, Michaels, Staples, Target, ToysRUs, Office Depot, Party City, and BJ's Wholesale Club.

16.     Paramont boasts of its distribution network, claiming that it "distributes product in 54 countries globally through regional sales and distributors located in the U.S.A., U.K., Ireland, Europe, Australia, Canada, and China."

17.     Paramont specifically identifies a distribution center in Dallas, Texas and a Design & Innovation center in Philadelphia, Pennsylvania on its website.

18.     Upon information and belief, an affiliate of Paramont, Ningbo Paramont Import & Export Co., Ltd., has filed for trademark protection for the word mark SUGAR RUSH, with the United States Patent and Trademark Office.

19.     Paramont has availed itself of the benefits and protections of the United States legal system.

**WEVEEL**

20.     On Paramont's website it has a link to WeVeel LLC's website, weveel.com, which automatically links to scentos.com, which is one of WeVeel LLC's tradenames.

21.     Upon information and belief, WeVeel LLC ("WeVeel") is a Delaware limited liability company with its principal place of business currently at 20 North Pennsylvania Avenue, Morrisville, Pennsylvania 19067, but until recently it was at 60 East Bridge Street, Suite 2, Morrisville, Pennsylvania 19067—the same location as Paramont's "USA Branch Office."

22.     Upon information and belief, the same Michael Pecci who is an officer and director of Paramont, is the managing member of WeVeel.

23.     Upon information and belief, Joel Chiapelli is the Art Director for WeVeel.

24.     Upon information and belief, Joel Chiapelli is United States citizen who resides in the Philadelphia area.

25.     WeVeel advertises that it has a Year Round Showroom at 67 Mody Road, Tsim Sha Tsui East, Kowloon, Hong Kong, China—the same address Paramont uses in Hong Kong.

26.     WeVeel also advertises that it has its China Headquarters at 3-4 F, No. 1 Building, HI-Tech Science & Technology Square, No. 1498, Jiangnan Road, Ningbo, China 315040—the same address as Paramont's headquarters.

27.     WeVeel advertises its phone number as (267) 797-5436—the same phone number Paramont uses for its "USA Branch Office."

28.     WeVeel owns a United States federal trademark registration for the marks SCENTOS, U.S. Registration No. 4046915 and SUGAR RUSH, U.S. Registration No. 4046915.

29.     On its website, WeVeel advertises products under the Scentos and Sugar Rush tradenames.

30.     Upon information and belief, WeVeel is an alter ego or agent of Paramont.

**EVERGREAT**

31.     Upon information and belief, Ningbo Evergreat Import and Export Co., Ltd. ("Evergreat") is a Chinese corporation with its principal place of business in Ningbo, China.

32.     Evergreat advertises on its website, evergreat.cn, that it is an export company focusing on the export of, among other things, party and stationary items to more than 50 countries and regions across the world.

33.     Evergreat states that it consists of seven subsidiaries and one factory.

34.     One of the divisions, or subsidiaries, that Evergreat identifies on its website is the Weveel Business Division.

35.     Evergreat advertises its "partners" as being: Darice, Target, Walmart, Staples, Michaels, Hobby Lobby, Dollar Tree, Galt, Unique Industries, Inc., Big Lots!, BJ's Wholesale Club, ASDA (part of the Walmart family), Kmart, Costco Wholesale, Cora, GiFi, Anker International, Artwrap Pty. Ltd., Jo-Ann Fabric and Craft Stores, and Tesco.

36.     On its website, Evergreat boasts that it is the exclusive supplier to WeVeel, one of America's fastest growing companies.

37.     Upon information and belief, the same Yongping "William" Yang who is the Chief Executive Officer of Paramont, is also the General Manager of Evergreat.

38.     Evergreat's headquarters is at 3-4 F, No. 1 Building, Hi-Tech Science & Technology Square, No. 1498, Jiangnan Road, Ningbo, China—the same address as Paramont's headquarters and WeVeel's Chinese headquarters.

39.     Evergreat has filed for trademark protection of the word marks SCENTOS and WEVEEL with the United States Patent and Trademark Office.

40.     Evergreat has availed itself of the benefits and protections of the United States legal system.

41.     Upon information and belief, WeVeel and Paramont are alter egos or agents of Evergreat.

42.     Upon information and belief, Evergreat, Paramont, and WeVeel regularly conduct business in the State of New York, and specifically in the area that comprises the United States District Court for the Southern District of New York.

**S<small>INOSURE</small>**

43.     Upon information and belief, Sinosure is a Chinese corporation with its principal place of business at Fortune Times Building, 11 Fenghuiyuan, Xicheng District, Beijing, China, 100033.

44.     Sinosure is an insurance company funded and owned by the Chinese government which was established for the purpose of promoting "Chinese exports of goods, technologies, and services," "by means of export credit insurance against non-payment risks."

45.     Sinosure owns United States federal trademark registrations for the marks SINO SURE, U.S. Registration No. 4561743 and SINOSURE, U.S. Registration No. 3322056, and has designated James M. Slattery from Birch Steward Kolasch & Birch LLP, P.O. Box 747, Falls Church, Virginia, as its domestic representative.

46.     Sinosure has sued, and been sued, in various United States District Court's throughout the United States.

47.     Sinosure has availed itself of the benefits and protections of the United States legal system.

48.     Upon information and belief, Sinosure regularly conducts business in the State of New York, and specifically in the area that comprises the United States District Court for the Southern District of New York.

49.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332 because the contracts between the parties are governed by the United Nations Convention on Contracts for the International Sale of Goods ("C.I.S.G."), and the parties are citizens of different states/countries and the amount in controversy exceeds $75,000 (USD).

50.     This Court has personal jurisdiction over Paramont because it entered into a contract with King Zak in this District to manufacture and deliver certain goods to King Zak in

this District, and for King Zak to pay for those goods from its headquarters, which are located in this District. In addition, the Court has personal jurisdiction over Paramont because, upon information and belief, it has committed a tort outside the State of New York that has had its effects within the State and it, or its alter egos/agents WeVeel and Evergreat, regularly do and solicit business from New York, engage in a persistent course of conduct in New York, derive substantial revenue from the sale of goods in New York, and/or derive substantial revenue from international commerce.

51. This Court has personal jurisdiction over WeVeel because it is the agent and/or alter ego of Paramont and Evergreat and it transacts business within New York and contracts to supply goods in New York. In addition, the Court has personal jurisdiction over WeVeel because it and/or its agents/alter egos Paramont and Evergreat committed a tort outside New York that has had its effects within the State and it regularly does and solicits business from New York, engages in a persistent course of conduct in New York, derives substantial revenue from the sale of goods in New York, and/or derives substantial revenue from international commerce.

52. This Court has personal jurisdiction over Evergreat because it and/or its agents and/or alter egos Paramont and WeVeel, transact business within New York and contracted to supply goods in New York. In addition, the Court has personal jurisdiction over Evergreat because it and/or its agents/alter egos Paramont and WeVeel committed a tort outside New York that has had its effects within the State and it regularly does and solicits business from New York, engages in a persistent course of conduct in New York, derives substantial revenue

from the sale of goods in New York, and/or derives substantial revenue from international commerce.

53.     This Court has personal jurisdiction over Sinosure because it has taken an assignment of Paramont's purported claims against King Zak and is attempting to pursue those claims against King Zak in New York.

54.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) and (3).

## FACTUAL BACKGROUND

55.     As a result of nearly thirty years in the tableware industry, King Zak has earned an enviable reputation of offering quality products at reasonable pricing featuring the King Zak trademarks.

56.     Over its long history, King Zak has worked with many manufacturers in China and other countries around the world and has achieved a highly respected reputation throughout the international community.

57.     Between October 13, 2014 and June 23, 2016, King Zak issued 58 purchase orders to Paramont for various types of plastic plates and bowls to be sold under its PARTY DIMENSION® and HANNA K® brands. The purchase orders were as follows:

| Purchase Order Number | Date Placed with Paramont |
|---|---|
| PO: 020038 | Placed: 10/13/2014 |
| PO: 020039 | Placed: 10/13/2014 |
| PO: 020040 | Placed: 10/13/2014 |
| PO: 020041 | Placed: 10/13/2014 |
| PO: 020042 | Placed: 10/13/2014 |

| PO: 020043 | Placed: 10/13/2014 |
|---|---|
| PO: 020044 | Placed: 10/13/2014 |
| PO: 020045 | Placed: 10/13/2014 |
| PO: 020046 | Placed: 10/13/2014 |
| PO: 020047 | Placed: 10/13/2014 |
| PO: 020048 | Placed: 10/13/2014 |
| PO: 020049 | Placed: 10/13/2014 |
| PO: 020050 | Placed: 10/13/2014 |
| PO: 020051 | Placed: 10/13/2014 |
| PO: 020052 | Placed: 10/13/2014 |
| PO: 020053 | Placed: 10/13/2014 |
| PO: 020054 | Placed: 10/13/2014 |
| PO: 020055 | Placed: 10/13/2014 |
| PO: 020056 | Placed: 10/13/2014 |
| PO: 020127 | Placed: 11/5/2014 |
| PO: 020409 | Placed: 1/30/2015 |
| PO: 020410 | Placed: 1/30/2015 |
| PO: 020411 | Placed: 1/30/2015 |
| PO: 020412 | Placed: 1/30/2015 |
| PO: 020617 | Placed: 4/2/2015 |
| PO: 020618 | Placed: 4/2/2015 |
| PO: 020886 | Placed: 8/26/2015 |
| PO: 020887 | Placed: 8/26/2015 |
| PO: 020888 | Placed: 8/27/2015 |
| PO: 020889 | Placed: 8/27/2015 |
| PO: 020893 | Placed: 8/27/2015 |
| PO: 020894 | Placed: 8/27/2015 |
| PO: 020895 | Placed: 8/27/2015 |
| PO: 020896 | Placed: 8/27/2015 |
| PO: 020897 | Placed: 8/27/2015 |
| PO: 020898 | Placed: 8/27/2015 |
| PO: 020899 | Placed: 8/27/2015 |
| PO: 020900 | Placed: 8/27/2015 |
| PO: 020901 | Placed: 8/27/2015 |
| PO: 021014 | Placed: 9/22/2015 |
| PO: 021159 | Placed: 11/24/2015 |
| PO: 021160 | Placed: 11/24/2015 |

| | |
|---|---|
| PO: 021161 | Placed: 11/24/2015 |
| PO: 021162 | Placed: 11/24/2015 |
| PO: 021163 | Placed: 11/24/2015 |
| PO: 021164 | Placed: 11/24/2015 |
| PO: 021165 | Placed: 11/24/2015 |
| PO: 021262 | Placed: 11/30/2015 |
| PO: 021263 | Placed: 11/30/2015 |
| PO: 021485 | Placed: 2/25/2016 |
| PO: 021486 | Placed: 2/25/2016 |
| PO: 021487 | Placed: 2/25/2016 |
| PO: 021488 | Placed: 2/25/2016 |
| PO: 021489 | Placed: 2/25/2016 |
| PO: 021490 | Placed: 2/25/2016 |
| PO: 021491 | Placed: 2/25/2016 |
| PO: 021611 | Placed: 4/8/2016 |
| PO: 021844 | Placed: 6/23/2016 |

58.     In total, King Zak received 100,944 cases of goods from Paramont and paid $2,249,351 (USD) for those goods.

59.     Prior to issuing the purchase orders, King Zak provided product specifications to Paramont, Paramont provided samples of the plates and bowls to King Zak, and King Zak approved the samples.

60.     Paramont represented that it owned the factory where the samples were made, that the samples conformed to the specifications provided, that the bulk shipments would be produced at the same factory, the bulk shipments would be the same as the samples, and the goods would be manufactured from food grade materials.

61.     Paramont also provided a Letter of Guarantee to King Zak stating that: "Here we Paremont Global Ltd. guarantee that the material of the clear plastic plates and bowls

white & color plastic plates and bowls which we sell to King Zak, are food grade materials. They're acceptable for food use. If any problem of material, we'll bear all responsibility."

62.     In February 2015, Paramont began to ship the goods to King Zak in Goshen, New York with payment terms of "DDP", which is an Incoterm that means "Delivered Duty Paid" and requires the seller to deliver the goods to the named place in the country of importation, i.e. Goshen, New York.

63.     To coordinate its orders and shipments, King Zak communicated, through a broker, with representatives from Evergreat.

64.     On May 28, 2015, a meeting was held at King Zak's offices in Goshen, New York.

65.     William Yang was at the meeting on behalf Paramont and provided King Zak with a business card that identified himself as the GM/President of Evergreat.

66.     "Ben" was at the meeting on behalf of Paramont and provided King Zak with a business card that identified himself as an Executive Vice-President of Paramont and identified Paramont's "USA Branch Office" as being at 1128 Blue Mound Road West, Suite 204, Haslet, Texas.

67.     John Yu was also at the meeting on behalf of Paramont and he provided King Zak with a business card that identified himself as the Supply Chain Director for Paramont and listed the same "USA Branch Office" address in Texas.

68.     And finally, Michael Pecci was also at the meeting on behalf of Paramont and he provided King Zak with a business card from WeVeel.

69.     At the May 28, 2015 meeting, Paramont again represented that the samples were manufactured at its factory, King Zak's orders were being manufactured at the same facility, were of the same quality as the samples, and were made of food grade materials.

70.     King Zak relied on Paramont's representations that the goods would be manufactured at the same facility as the samples, be of the same quality as the samples, and be made of food grade materials.

71.     Paramont received the King Zak purchase orders identified in paragraph 47 above, retained them without objection or modification, and attempted to perform by filling the orders.

72.     However, Paramont breached its agreement with King Zak by providing inferior products that were defective, failed to conform to the approved samples, and were not made of food grade materials.

73.     Moreover, the goods received were not sanitary when delivered in Goshen, New York and were unmerchantable.

74.     In recognition of its breach, Paramont provided certain credits to King Zak toward the purchases and promised to rectify the manufacturing problems but, as addressed below, the problems were not rectified.

75.     King Zak later learned that Paramont's representation that the samples and goods were, and would be, manufactured at its facility was false.  Upon information and belief, the samples were manufactured at one facility and the bulk production was manufactured predominantly at second facility; neither facility was solely or wholly owned by Paramont.

76.     Paramont also learned that some of the materials being used to manufacture the goods were not food safe.

77.     As a result of receiving defective merchandise from Paramont, King Zak received many consumer complaints associated with the products and at least two consumers suffered personal injuries associated with use of the defective products.

78.     After receiving the customer complaints, King Zak engaged in good-faith efforts to resolve the issues with Paramont, but without success.

79.     On May 11, 2016, a meeting was held at King Zak's Goshen, New York offices with JP Morgan from WeVeel and Hongjing Deng, who said she worked for Paramont and WeVeel.

80.     During the meeting, Mr. Morgan and Ms. Deng inspected the defective goods that had been provided by Paramont and agreed that the goods were defective.

81.     Mr. Morgan and Ms. Deng represented that they were preparing a report for Paramont.

82.     Following the May 11, 2016 meeting, Mr. Morgan prepared a report for representatives of Evergreat, WeVeel, and Paramont where he said:

Hongjing and I went on inspection yesterday.

We hand selected a random 30 cases to inspect. We opened still wrapped pallets and chose different dated carton.

Results were not good. And we broke threshold for inspecting 84 cases – on the 30 we were able to see from the time we were there. Everything we were asked to inspect had visible problems and quality problems. Was hoping for a different result. But couldn't expect people to eat food out of these plates and bowls. Verdict is the SKUs listed in the report are **not saleable**.

83.    The visible problems, as witnessed by Mr. Morgan, were:

Plastic in between the plates, like shards of plastic. China hair in some instances. It comes in boxes from China. It's just Chinese hair. We have a lot of it here. Bugs in certain instances. Sometimes the plates were warped or broken.

84.    On May 17, 2016, Mr. Morgan again sent an email to representatives from Evergreat, Paramont, and WeVeel stating: "Whoever is on this this—I need them to start talking to Noah/King Zak (Steven Kaye skaye@kingzak.com) NOW. We did the random inspection. The plates were unsaleable."

85.    Mr. Morgan has confirmed that none of the goods he inspected at King Zak were salvageable.

86.    Ms. Deng concurred with Mr. Morgan's assessment of the plates and bowls, testifying that the plates and bowls melted when hot liquid was placed in or on them, that the goods as shipped had human hair and dust inside the packaging.

87.    And finally, internally at Evergreat/Paramont/WeVeel, Paramont's Vice-President, Caitlyn Kelly, admitted on May 18, 2016 that plates and bowls sold to King Zak were unsaleable and King Zak could not be expected to pay for them:

John,

Thank you for addressing this yesterday. I need you to do some additional follow up today.

I am certain you saw my email to Noah a few moments ago. Obviously I want to get us the best solution I possibly can from their side. That said- I have seen the samples of the product and reviewed all of the reports from JP's inspection. The product is unsaleable and has quite a few critical quality issues. If they cannot sell it- we cannot expect them to pay for it in complete- it is simply unreasonable.

88. Following the meeting, King Zak had a number of follow-up communications with Paramont/Evergreat/WeVeel regarding the report and seeking a resolution to the problem.

89. Defendants admitted that certain goods were manufactured from polyvinyl chloride ("PVC"), not polystyrene; PVC is not food grade material.

90. On June 29, 2016, Caitlin Park Kelly from Paramont/WeVeel and Michael Pecci visited King Zak's office in Goshen, New York to discuss the problems.

91. Ms. Kelly provided a business card to King Zak at that meeting, holding herself out to be a representative of Paramont and which indicated that Ms. Kelly worked out of Paramont's "USA Branch Office" at 60 East Bridge Street, Suite 2, Morrisville, Pennsylvania 19067—on the back of the card was WeVeel's logo.

92. At the meeting, Ms. Kelly acknowledged that Paramont's goods were non-conforming.

93.     Ms. Kelly and Mr. Pecci brought a box of "new and improved" samples to the meeting in an effort to cure Paramont's breaches, but the samples were brittle and unsellable, and not in compliance with the approved samples from the beginning of the relationship, so they withdrew the samples from consideration before the meeting had concluded.

94.     King Zak attempted to negotiate a final resolution concerning Paramont's breaches, but it was unsuccessful.

95.     As such, King Zak was forced to make other arrangements with a United States' manufacturer to supply the plates and bowls at a premium, in order for King Zak to fill its outstanding orders.

96.     King Zak set aside the defective goods received from Paramont, which was the stock inspected by Mr. Morgan and Ms. Deng, and informed Paramont that it could retrieve the goods from King Zak's warehouse; Paramont has not retrieved the goods, so King Zak has continued to incur storage costs for those goods.

**Paramont/Evergreat File A Claim With Sinosure**

97.     Recently King Zak learned that in approximately September 2016, Paramont and/or its affiliates resorted to filing false, defamatory, and libelous claims with its insurance carrier, Sinosure, alleging that King Zak defaulted on pending invoices and/or refused to make payment when payment was properly due.

98.     Sinosure is an entity owned by the Chinese government that provides export credit insurance to Chinese manufacturers who are exporting their goods internationally.

99.     Upon information and belief, Sinosure has not paid anything to Paramont/Evergreat on the claim that was filed, but rather took an assignment of the collection rights that Paramont/Evergreat may have on the purchase orders issued by King Zak to Paramont.

100.     On September 26, 2016, J. Michael Jones, Esq. from Brown & Joseph Ltd. in Illinois, wrote a collections letter to King Zak's counsel threatening that King Zak's "failure to cooperate may result in restrictions on King Zak's credit and inability to import goods from the People's Republic of China in the future."

101.     Mr. Jones requested a response documenting King Zak's "alleged dispute regarding" the balance at issue.

102.     King Zak provided the requested response, including substantial documentation showing that the goods provided by Paramont were defective.

103.     Sinosure refused to even review the documentation provided by King Zak.

104.     On January 16, 2017, Don A. Leviton, Esq. from the Leviton Law Firm, Ltd. in Illinois, wrote to King Zak's counsel claiming to have taken over Sinosure's representation from Brown & Joseph, Ltd.

105.     Mr. Leviton stated: "I am advising you that your client must make arrangements with me to pay the outstanding obligation no later than January 18, 2017. Should you ignore our efforts to resolve this matter, we will have no choice but to refer this matter to local counsel in New York for immediate suit. Please further note that Sinosure (the only credit

insurance company in China) will suspend your client's credit and King Zak Industries, Inc. and any affiliate company will be unable to import goods from any vendor in China until the above balance is paid in full."

106.     King Zak responded on January 17, 2017, explaining that it had previously responded to Brown & Joseph regarding the disputed claim and the basis for the dispute.

107.     King Zak also noted that it had provided all of the requested documentation to Brown & Joseph.

108.     Despite receiving voluminous documentation from King Zak demonstrating that the goods at issue were defective, and the internal communications at Paramont/Evergreat/WeVeel acknowledging that the goods at issue were defective, Sinosure followed through on its September 26, 2016 economic threat and downgraded King Zak's credit rating, reporting to King Zak's other Chinese suppliers that it defaults on payments, resulting in King Zak's other suppliers being unwilling to proceed with new orders for goods.

109.     Sinosure continues to inform King Zak's Chinese manufacturers that it defaults on payments and it has maintained a low credit rating for King Zak, and it has continued to threaten King Zak with litigation in New York.

110.     The actions of Sinosure, Paramont, and its agents/alter egos WeVeel and Evergreat, have interfered with King Zak's existing and future relationships with its Chinese manufacturers.

111.     Specifically, on December 5, 2017, Shangai Ashburn Aluminium Foil Products Co., Ltd. refused to do business with King Zak because Sinosure would not insure the transaction as a result of the Paramont claim.

112.     In March 2018 Ningbo Homelink Eco-iTech Co.,Ltd. raised concerns about doing business with King Zak because Sinosure has "black listed" King Zak as a result of the Paramont claim.

113.     On July 19, 2018, Ningbo Homelink Eco-iTech Co., Ltd. proposed FOB terms instead of DDP terms, in order to do business with King Zak, which is not customary in the industry, and the reason given by Homelink was the Paramont claim with Sinosure.

114.     King Zak has suffered damage to its reputation, damage to its existing and future business relationships in China, storage costs, lost sales, cover damages, and other direct and consequential damages, due to Defendants' conduct.

## FIRST CAUSE OF ACTION
### (Breach of Contract under the C.I.S.G.)

115.     King Zak repeats and realleges the allegations contained in paragraphs 1 through 114 as if fully set forth here.

116.     King Zak provided product specifications, approved samples, and issued purchase orders for those goods to Paramont.

117.     Paramont accepted the purchase orders without objection or modification, attempted to perform the contracts, and delivered the goods to King Zak in Goshen, New York.

118.     King Zak then resold the goods to its customers.

119.     After receiving the complaints from its customers, King Zak learned that the goods failed to conform to the product specifications and approved samples, were not made of food grade materials, were not shipped in sanitary conditions and, therefore, were not merchantable.

120.     King Zak timely notified Paramont of the non-conformance and attempted to reach a resolution.

121.     When no resolution could be reached, King Zak obtained cover goods to fulfill its orders.

122.     King Zak has suffered at least $285,000 in monetary damages as a result of Paramont's breach of the purchase orders.

## SECOND CAUSE OF ACTION
### (Fraudulent Inducement)

123.     King Zak repeats and realleges the allegations contained in paragraphs 1 through 122 as if fully set forth here.

124.     Prior to issuing any purchase orders to Paramont, King Zak provided product specifications to Paramont to produce samples for review and approval.

125.     Paramont/Evergreat/WeVeel produced samples that were represented to King Zak to be manufactured at Paramont's factory and would be the same as the final product delivered to King Zak.

126.     Paramont/Evergreat/WeVeel also represented that the goods would be manufactured with food grade materials.

127.     King Zak relied on Defendants' representations and entered into orders with its customers to provide those goods.

128.     Defendants' representations were a material inducement to King Zak to issue the purchase orders to Paramont.

129.     Defendants' representations as to both the quality of the goods and the manufacturing source were false and, upon information and belief, Defendants knew the representations were false when they made them.

130.     King Zak suffered at least $285,000 in monetary damages as a result of Paramont's/Evergreat's/WeVeel's false representations.

## THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

131.     King Zak repeats and realleges the allegations contained in paragraphs 1 through 130 as if fully set forth here.

132.     Prior to issuing any purchase orders to Paramont, King Zak provided product specifications to Paramont to produce samples for review and approval.

133.     Paramont/Evergreat/WeVeel produced samples that were represented to King Zak to be manufactured at its factory and would be the same as the final product delivered to King Zak.

134.    Paramont/Evergreat/WeVeel also represented that the goods would be manufactured with food grade materials.

135.    King Zak relied on Defendants' representations and entered into orders with its customers to provide those goods.

136.    Defendants' representations were a material inducement to King Zak to issue the purchase orders to Paramont.

137.    Defendants knew or should have known that their representations as to both the quality of the goods and the manufacturing source were not accurate.

138.    King Zak suffered at least $285,000 in monetary damages as a result of Paramont's/Evergreat's/WeVeel's negligent misrepresentations.

## FOURTH CAUSE OF ACTION
### (Fraud)

139.    King Zak repeats and realleges the allegations contained in paragraphs 1 through 138 as if fully set forth here.

140.    Prior to issuing any purchase orders to Paramont, King Zak provided product specifications to Paramont to produce samples for review and approval.

141.    Paramont/Evergreat/WeVeel produced samples that were represented to King Zak to be manufactured at its facility and would be the same as the final product delivered to King Zak.

142.     Paramont/Evergreat/WeVeel also represented that the goods would be manufactured with food grade materials.

143.     Paramont/Evergreat/WeVeel continued to represent that the goods were manufactured at Paramont's factory at the May 28, 2015 meeting, the May 11, 2016 meeting, and the June 29, 2016 meeting.

144.     King Zak relied on Paramont's representations when entering into orders with its customers to provide those goods.

145.     Defendants' representations were material to King Zak because of the reputation it has in the market and its intent to resell the product under its tradenames.

146.     Defendants' representations as to both the quality of the goods and the manufacturing source were false and, upon information and belief, Defendants knew the representations were false when they made them.

147.     King Zak suffered at least $285,000 in monetary damages as a result of Paramont's/Evergreat's/WeVeel's fraud.

## FIFTH CAUSE OF ACTION
### (Tortious Interference With Prospective Business Relations)

148.     King Zak repeats and realleges the allegations contained in paragraphs 1 through 147 as if fully set forth here.

149.     King Zak has relationships with other Chinese manufacturers to provide goods for its business.

150.     King Zak relies upon export of those goods from China to the United States in order to maintain its business.

151.     Paramont/Evergreat/WeVeel have intentionally interfered with King Zak's relationships with other Chinese manufacturers by submitting a false and fraudulent claim with Sinosure, alleging that King Zak does not pay its invoices.

152.     As a result, Sinosure has downgraded King Zak's credit rating in China, threatened to stop all exports from China to King Zak, and has contacted other manufacturers in China who have, or may, work with King Zak to inform them that King Zak does not pay its invoices.

153.     Sinosure has continued to contact King Zak's potential manufacturers, and threatened to interfere with all exports to it from China, despite receiving voluminous records from King Zak establishing that it has no liability to Paramont and, rather, it is Paramont who has breached its contracts and engaged in fraud *vis-à-vis* King Zak.

154.     The change in King Zak's credit rating has caused it to incur additional costs to purchase and export goods from China to the United States, and if all exports are stopped, King Zak will incur substantial cost increases to procure the goods from other markets.

155.     As a result of Paramont's/Evergreat's/WeVeel's and Sinosure's tortious actions, King Zak has incurred at least $500,000 in damages.

## SIXTH CAUSE OF ACTION
### (Declaratory Judgment)

156.     King Zak repeats and realleges the allegations contained in paragraphs 1 through 155 as if fully set forth here.

157.     King Zak provided product specifications, approved samples, and issued purchase orders for those goods to Paramont.

158.     Paramont accepted the purchase orders without objection or modification, attempted to perform the contracts, and delivered the goods to King Zak in Goshen, New York.

159.     Upon receipt of complaints from its customers, King Zak learned that the goods failed to conform to the product specifications, failed to conform to the approved samples, were not shipped in sanitary conditions and, therefore, were not merchantable.

160.     King Zak timely notified Paramont of the non-conformance and attempted to reach a resolution.

161.     When no resolution could be reached, King Zak obtained cover goods to fulfill its orders.

162.     Paramont claims that King Zak failed and refused to pay certain outstanding invoices for the defective goods.

163.     Upon information and belief, Paramont filed an insurance claim with its insurer, Sinosure, to receive payment on those invoices.

164.     Upon information and belief, Paramont assigned its claims for the disputed invoices to Sinosure.

165. Sinosure has threatened to commence a collections action against King Zak in New York and stop all exports from China to King Zak as a result of the dispute.

166. In addition, Sinosure has contacted King Zak's current Chinese manufacturers, and potential Chinese manufactures, to incorrectly inform them that King Zak does not pay its invoices.

167. King Zak has informed Sinosure that it did not breach any agreements with Paramont as the goods did not conform to the specifications or approved samples, were delivered in an unsanitary condition, and were unmerchantable.

168. There is a justiciable controversy as to whether King Zak owes any monies under the disputed invoices.

169. Pursuant to the Declaratory Judgment Act, 28 U.S.C. section 2201, King Zak is entitled to a judgment declaring the rights and duties of the parties and, in particular, declaring that (i) it owes no monies under the disputed invoices, (ii) Sinosure must remove the Paramont claim from King Zak's credit analysis, and (iii) Sinosure shall not interfere with the export of goods from China to King Zak as a result of the Paramont dispute.

## SEVENTH CAUSE OF ACTION
### (Indemnification)

170. King Zak repeats and realleges the allegations contained in paragraphs 1 through 169 as if fully set forth here.

171. King Zak disputes that it owes any monies to Sinosure.

172.     However, in the event a Court were to find that King Zak owes any monies to Sinosure, it would be due solely to the improper acts of Paramont/Evergreat/WeVeel.

173.     Accordingly, in the alternative, to the extent King Zak is found liable to Sinosure, it is entitled to indemnification from Paramont/Evergreat/WeVeel.

**WHEREFORE**, King Zak demands judgment as follows:

a.      On its first cause of action, a money judgment against Paramont/Evergreat/WeVeel;

b.      On its second cause of action, a money judgment against Paramont/Evergreat/WeVeel;

c.      On its third cause of action, a money judgment against Paramont/Evergreat/WeVeel;

d.      On its fourth cause of action, a money judgment against Paramont/Evergreat/WeVeel;

e.      On its fifth cause of action, a money judgment against Paramont/Evergreat/WeVeel and Sinosure;

f.      On its sixth cause of action, a judgment declaring the rights and duties of King Zak and Sinosure under 28 U.S.C. section 2201;

g.      On its seventh cause of action, a judgment that to the extent King Zak owes any monies to Sinosure, Paramont/Evergreat/WeVeel must indemnify it for those monies;

h.      Costs, disbursements, and attorneys' fees as allowed by law; and

i.      Such other and further relief as the Court deems proper.

Dated:      October 29, 2018

**HODGSON RUSS** LLP
*Attorneys for King Zak Industries, Inc.*

By: /S/ Neil B. Friedman              
      Ryan K. Cummings
      Neil B. Friedman
      Carmine J. Castellano
605 3rd Avenue, Suite 2300
New York, New York 10158
Telephone: (212) 751-4300
Email:*ryan_cummings@hodgsonruss.com*
Email: *nfriedma@hodgsonruss.com*
Email: *ccastellano@hodgsonruss.com*

082073.00048 Litigation 14915218v2